# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| CODY LUCAS, individually and on behalf of other similarly situated individuals, | |
| Plaintiff, | Civil Action No. |
| v. | **CLASS ACTION COMPLAINT** |
| SPORTRADAR, US; MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, LP; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, LP, | **JURY TRIAL DEMAND** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Cody Lucas, brings this Class Action Complaint against Defendants, Major League Baseball ("MLB") and MLB Advances Media, LP ("MLBAM") (collectively, the "MLB Defendants"), Sportradar, US ("Sportradar"), Houston Astros, LLC (the "Astros"), and Boston Red Sox Baseball Club, LP (the "Red Sox"), to recover damages for Defendants' unlawful manipulation of baseball players' performance statistics and to seek redress for all those who have been harmed by Defendants' misconduct. Plaintiff alleges as follows based on personal knowledge as to himself and his own acts and experiences, and as to all other matters, on information and belief, including an investigation by his attorneys.

## NATURE OF THE CASE

1.      Historically, the MLB has taken a firm stance against gambling in professional baseball. However, the MLB's position on gambling started to change once they realized that it could be profitable for them. In 2015, the MLB started to invest in Daily Fantasy Sports ("DFS") fantasy baseball and promote its fans' participation in DFS wagering.

2.      Through fans' participation in DFS wagering, the MLB gains a quantifiable benefit financially, not only through the sharing of contest fees with the DFS platform, but also through larger attendance at games, increased revenue through advertising, and general interest associated with the sport as a whole.

3.      Accordingly, the MLB substantially rooted itself in the DFS world by forming a partnership with one of the main daily fantasy platforms in the industry.[1] This partnership provided, and still provides to date, that MLB Defendants will actively promote DFS baseball competitions, grant promotional advertising rights, include the use of MLB league and team logos, and afford rights and sponsorship opportunities to MLB constituent teams.[2]

---

[1] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESS WIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/eb/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Feb. 6, 2020).
[2] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deal with 27 Major League Baseball Teams,* LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Feb. 6, 2020)

4.     Recently, the MLB Defendants' have expanded their partnership to include other gambling platforms, including DFS company FanDuel Inc. ("FanDuel").[3] This partnership added FanDuel as one of the MLB's "authorized gaming operators," granting access to use MLB official team and league logos, opportunities for sponsorship deals, promotions with MLB member team constituents, and most importantly, access to MLB's official data feed to be used within its gambling platform.[4] Additionally, MLB Defendants announced their partnership with Sportradar, a global leader in sports data intelligence, to have the exclusive rights to the distribution of MLB's real time game statistics.[5] Per its partnership agreement, these real time game statistics are collected at every ballpark and distributed to both media companies and *sports betting operators* such as FanDuel. Sportradar's duties in relation to these statistics includes the installation of integrity protection measures where it will use its "Integrity Services" to "monitor and analyze every MLB game via its award-winning fraud detection system and providing the MLB with educational components, as well as access to its intelligence and investigations services."[6]

5.     In DFS competitions, such as those that FanDuel provides, participants pay entry fees to reserve their spot in contests, equivalent to placing bets and gambling. The

---

[3] *FanDuel Group and Major League Baseball Announce Sports Betting Partnership*, FANDUEL (Aug. 15, 2019) https://newsroom.fanduel.com/2019/08/21/fanduel-group-and-major-league-baseball-announce-sports-betting-partnership/ (accessed Feb. 6, 2020)
[4] Bill King, *MLB Adds Fanduel To Portfolio of Sports Betting Providers*, SPORTS BUSINESS DAILY, (Aug. 15, 2019) https://www.sportsbusinessdaily.com/Daily/Issues/2019/08/15/Marketing-and-Sponsorship/FanDuel.aspx (accessed Feb. 6, 2020)
[5] *Major League Baseball and Sportradar Announce Official Exclusive Global Partnership*, SPORTRADAR (February 27, 2019), https://sportradar.us/2019/02/major-league-baseball-and-sportradar-announce-official-exclusive-global-partnership/ (accessed Feb. 13, 2020)
[6] *Id.*

participants then assemble virtual teams of real MLB players which "compete" against other participants' teams in these contests. The winners of each contest are based on the statistical performance of the assembled players that the participants have selected. The statistics used to score the competitions are the official MLB statistics, monitored and distributed by Sportradar, that FanDuel has been granted access to use based on its partnership with the MLB Defendants.

6.     Competitors "draft" players onto their team to fill a roster of players which must remain under a set salary cap. Each individual player has an assigned salary that when drafted will be attributed to the participant's team's salary cap. The individual player's salary is largely determined on their projected performance for that day's real-life MLB game.

7.     Entry fees to these competitions range from anywhere between less than $1.00 up to almost $11,000, many times including hundreds of thousands of competitors. There are many different types of competitions and a participant can win head-to-head matchups against other participants, or against hundreds of thousands of participants in a "tournament" style pool.

8.     These DFS leagues have grown wildly popular and are now part of a multi-million-dollar industry that the MLB Defendants are direct participants and beneficiaries of.

9.     The MLB is composed of 30 teams, 29 in the United States and 1 in Canada, representing the highest level of professional baseball. By partnering with FanDuel, the

MLB and its constituent teams, including Defendants Astros and Red Sox, have been complicit in persuading fans to participate in FanDuel's DFS wagering competitions.

10.     By embracing DFS wagering platforms, the MLB has popularized fantasy games and encouraged fans to make wagers by paying entry fees for competitions to take a financial stake in their league's games. FanDuel, the MLB, and MLB's affiliate teams, including the Astros and Red Sox, derive enormous financial benefit from fans' participation in these fantasy games.

11.     Fans entering these wagering competitions, as advertised by the MLB, relied on the league being an advocate for the enforcement of its Official Rules and regulations. Specifically, participants relied on the integrity and fairness of statistics, monitored and distributed by Sportradar, that are used to score and determine the winners of DFS competitions. As related to this lawsuit, the MLB's Official Rules and other regulations expressly prohibit the use of any electronic devices to decode or attempt to decode sign between pitcher and catcher, also known as "pitch stealing."

12.     In November 2019, Ken Rosenthal and Evan Drellich reported, via *The Athletic*, a scandal within Major League Baseball, describing a scheme by the Astros using electronic devices to steal signs from their opponent and relay them to their players on the field.[7] This conduct occurred during the 2017 season, one in which the Astros won the World Series.

---

[7] Ken Rosenthal and Evan Drellich, *The Astros Stole Signs Electronically in 2017 – Part of a Much Broader Issue for Major League Baseball*, THE ATHLETIC, (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Feb. 7, 2020).

13.     Following the public revelation of the Astros' conduct, *The Athletic* reported a that the Red Sox had also used similar electronic devices to steal signs from their opponent during the 2018 MLB season, a season in which the Red Sox won the World Series.

14.     In January 2020, the MLB released its own report on the results of its investigation into the Astros' sign stealing scandal. The report found the Astros culpable for violating the MLB Official Rules and regulations and fined the organization $5 million.

15.     In light of the MLB's findings, the Astros' front office fired general manager Jeff Luhnow and manager A.J. Hinch. Other managers named in the scandal, Red Sox manager Alex Cora and Mets manager Carlos Beltran, were fired from their respective positions within their organizations.

16.     The manipulative and deceitful conduct of at least two of MLB's most successful teams and their employees has, at the very least, profoundly affected baseball since early 2017, and continues to do so through the 2019 postseason. The effects of this scandal substantially impacted the outcome of thousands, if not hundreds of thousands, of DFS wagering competitions and participants.

17.     While actively inducing their fans to enter into DFS wagering competitions based on Official MLB Sportradar statistics, MLB member teams were engaged in misconduct in violation of MLB's Official Rules and Regulations. The MLB's lack of oversight and its constituent member teams' cheating destroyed the fairness of DFS wagering competitions.

18.     The fans who engaged in fantasy wagering, that were largely encouraged by the MLB, were unaware that the MLB had been ignoring the fraudulent conduct of its constituent teams. Further, participants were unaware that the MLB had failed to uphold its commitment to preserving the honesty and integrity of its baseball games. Specifically, participants of FanDuel wagering were unaware that MLB had failed to enforce its rule prohibiting the use of electronic devices to steal signs and relay them to players on the field, skewing the outcomes of DFS competitions.

19.     FanDuel is authorized to use MLB Defendants' official statistics. But the MLB's misconduct and cheating by its constituent teams distorted player's statistics, impacting the outcomes of MLB games and thus altering the outcomes of fantasy baseball competitions. Accordingly, by luring fans to participate in DFS competitions, where its constituent teams were engaging in corrupt and fraudulent conduct, the MLB undermined the fairness of and integrity of DFS participants' wagers.

20.     MLB ignored the fraudulent conduct of its constituent teams and failed to investigate, prevent, enforce, or—importantly for DFS participants—disclose the wrongful activity. Even according to its own investigations, teams' cheating had been occurring in MLB since, at the very least, early 2017, but it was not disclosed to the public until very recently.

21.     Plaintiff Cody Lucas, along with millions of other similarly situated MLB fans who participated in DFS wagering competitions, have been harmed due to Defendants' fraudulent and deceitful conduct. Plaintiff and other contestants placed wagers in DFS competitions under the belief that players' statistics provided by Sportradar were derived

in accordance with MLB Official Rules and regulations. Plaintiff and contestants were unaware that the outcomes of DFS competitions were skewed by MLB and its constituent member teams' cheating scandal, which MLB concealed and/or willfully ignored. Plaintiff and other contestants would not have participated in FanDuel's DFS wagering competitions and/or would have been unwilling to make certain wagers had they been aware that the fairness and integrity of players' statistical measures were compromised.

22.    As a result, Plaintiff and other DFS participants have sustained monetary losses. On his own behalf and on behalf of a class of other DFS participants, Plaintiff seeks an award of damages to recover the amounts of fees and wagers lost in corrupt DFS baseball wager competitions. In addition, Plaintiff seeks statutory damages, equitable relief, attorney's fees and costs, as well as pre-judgment interest and all other relief that is warranted by applicable law.

## JURISDICTION AND VENUE

23.    This Court has federal subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*, because this case is a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are greater than 100 putative class members; at least one putative class member is a citizen of a state other than Defendants' states of citizenship; and none of the exceptions under subsection 1332(d) apply to the instant action.

24.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the District, as Defendant Sportradar's headquarters are in this District and the

compromised statistics used and relied on by Plaintiff and the other DFS participants were reviewed, analyzed, and distributed, within and from this District.

## **PARTIES**

25.     Plaintiff Cody Lucas is a resident of New York.

26.     Defendant Major League Baseball ("MLB") is an unincorporated association whose members are thirty clubs. MLB's headquarters are located at 1271 Avenue of the Americas, New York, New York.

27.     Defendant MLB Advanced Media, LP ("MLBAM") is a limited partnership comprised of owners of MLB's membership teams. Its principal place of business is located at 1271 Avenue of the Americas, New York, New York. Defendant is primarily responsible for marketing the MLB.

28.     Defendant Houston Astros, LLC (the "Astros") is a Texas limited liability corporation that owns and operates the Houston Astros MLB team. The Astros conduct substantial business in this District individually and as a member of MLB.

29.     Defendant Boston Red Sex Baseball Club LP (the "Red Sox") is a Massachusetts limited partnership that owns and operates the Boston Red Sox MLB team. The Red Sox conduct substantial business in this District individually and as a member of MLB.

30.     Defendant Sportradar, US ("Sportradar") is a Minnesota company that collects, reviews, analyzes, and distributes statistics from MLB games, including games played by the Red Sox and the Astros, to DFS entities such as FanDuel, and the MLB itself.

## **COMMON FACTUAL ALLEGATIONS**

**I.**     **Fantasy Baseball and Daily Fantasy Sports**

31.     Fantasy Baseball is a statistical based competition where participants draft their respective "fantasy team" consisting of MLB players to compete against the fantasy teams of other participants.

32.     The real-life statistics of the MLB players that participants have selected for their fantasy team indicate their performance. Statistics are translated into points for competitive scoring purposes and points are awarded to teams when one of their fantasy players records a performance statistic. For example, when a player hits a homerun, whoever drafted that player into their fantasy team lineup is awarded points for his player's homerun. All of the scoring in fantasy baseball is objectively measurable, and the participant whose fantasy team has been awarded the most points wins the competition.

33.     Fantasy sports competitions, such as fantasy baseball, are defined as a "game of skill," which grants them an exemption from federal prohibitions on illegal gambling.

34.     In Daily Fantasy Sports, or DFS, participants compete in daily competitions where they draft a fantasy team of MLB players for that specific competition, rather than keeping those players over the course of an entire season. A participant could select a different player per lineup they enter, and even enter multiple lineups into one competition depending on its structure.

35.     DFS participants' decisions about how to build their fantasy teams are entirely based on MLB players' real world performance and statistics.

36.     For instance, DFS participants must structure their fantasy lineup to stay under a given salary cap. Each real-life MLB player is assigned a salary which is largely conditioned on how well the player is expected to perform on that day. Better players have a higher salary than others.

37.     Further, the scoring of points in DFS is tied directly to the real-life performance of MLB players and the statistics that are used are all objectively measurable. These statistics and points are the primary determinant of whether or not a participant in a DFS wager competition wins or loses money.

38.     In order to enter into a DFS wager competition, the participant must pay an entry fee similar to placing a bet and have a viable lineup that is under the salary cap. The entry fee is good for one lineup. Entry fees can range between less than $1 to over $10,000, and contestants can enter competitions that allow the entry of thousands of lineups.

39.     A portion of the entry fee (about 4.5%) is kept by the DFS platform, such as FanDuel, as a payment for its services, and the remainder is used to fund the competition. For example, in head-to-head matchups, each contestant could wager $270 and then be awarded $500 upon winning. FanDuel would keep the extra $40.

40.     DFS competitions have become enormously popular and lucrative for all hosting parties. FanDuel has recently received a valuation of over $1 billion with a userbase

of over 6 million players.[8] It has been estimated that FanDuel makes $100 off each customer per season.[9]

41.     In 2015, the MLB started to invest in and promote DFS fantasy baseball, and encourage its fans to participate in wagering on DFS competitions. The size of MLB's investment remains undisclosed. However, it was described as "sizable enough to reap meaningful benefit from the rise of daily fantasy."[10]

42.     The MLB's involvement in advertising DFS competitions grew its popularity and induced its fans to participate in DFS competitions. In turn, by fans participating in DFS wagering, the MLB gains a quantifiable benefit financially not only through the sharing of contest fees with the DFS platform, but also through larger attendance at games, increased revenue through advertising, and general interest associated with the sport as a whole.

43.     The MLB's official partnership with FanDuel established them as one of the MLB's "authorized gaming operators." This partnership grants FanDuel access to use MLB official team and league logos, opportunities for sponsorship deals, promotions with MLB member team constituents, and most importantly, access to MLB's official data feed to be used within its gambling platform.

---

[8] Shoshanna Delventhal, *How FanDuel and DraftKings Work*, INVESTOPEDIA, (Jun. 25, 2019) https://www.investopedia.com/articles/investing/122415/how-fanduel-and-draftkings-work.asp (accessed Feb. 7, 2020)
[9] *Id.*
[10] Eric Fisher, *A look into DraftKings' MLB Deal,* SPORTS BUSINESS JOURNAL (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Feb. 7, 2020)

44.     Sportradar handles the distribution and monitoring of the official data feed and the resulting real game time statistics for MLB games to these DFS operators, such as FanDuel.

45.     The MLB's and other Defendants' aggressive marketing of DFS wagering competitions to its fans has resulted in hundreds of millions of dollars of participants' entry fees being paid to FanDuel, for the financial benefit of Defendants.

## II.     The Use of Electronic Devices to Steal Signs is Expressly Prohibited

46.     Defendant MLB, through the Office of the Commissioner, is responsible for the operation of Major League Baseball. The MLB has thirty constituent teams which include the Astros and Red Sox.

47.     The MLB's constituent teams collectively own Defendant MLBAM, which is responsible for providing marketing services for MLB and its teams while providing oversight in the promotion of partnerships, such as that with FanDuel.

48.     The MLB Defendants are governed by its codified MLB Official Rules and other regulations, which explicitly state the league's standards for on-field conduct. Pursuant to these Official Rules and other regulations, the use of any electronic devices to decode or attempt to decode the communications between a catcher and a pitcher, commonly referred to as "signs," is prohibited.

49.     When an opponent gains recognition of the signs between a catcher and pitcher, or "steals" the sign, it can provide a significant advantage to the batter, who will then be aware of the upcoming pitch. When this is done by using electronic devices, it is in violation of the MLB Official Rules and other regulations. Illustrative of this point, MLB

pitcher Alex Wood stated, "I would rather face a player that was taking steroids than face a player that knew every pitch that was coming."[11]

50.     The ability to take advantage of sign stealing became exceedingly easy in 2014 when MLB constituent teams were allowed to create review rooms for the purpose of reviewing video footage to challenge plays called by the game officials. This practice is similar to what fans have seen in the NFL with "coach's challenges" and "booth reviews."

51.     With review rooms in every stadium, MLB teams, including the Astros and Red Sox, began using video and electronic devices to "steal" the signs of the opposing team's pitcher and catcher, and created various schemes to relay the information from the review room to the batters. In 2017, numerous MLB teams reported concerns to MLB's Office of Commissioner that clubs were using electronic devices to steal their signs.

## III.     <u>Sign Stealing Manipulated DFS Contests to the Detriment of the Class</u>

52.     Electronic sign stealing directly affects player performance statistics, and therefore, the teams and players that participate in electronic sign stealing compromise the fairness and integrity of DFS wagering competitions. Because each contest is based on MLB players' real-life performance during a given game, a violation of MLB Official Rules and other regulations manipulates DFS wagering by skewing competition outcomes and undermining the player selection process.

53.     Since at least 2017, the MLB has been well aware of its constituent teams' violations of its rules prohibiting electronic sign stealing. However, it elected to not take

---

[11] Alex Wood (@Awood45), TWITTER (Jan. 16, 2020, 1:37PM), https://twitter.com/Awood45 /121792855156760577 (accessed Feb. 7, 2020)

reasonable steps to investigate, deter, prevent, remedy, or disclose the fraudulent conduct to the public.

54.     Instead, the MLB continued to encourage its fans to participate in DFS wagering competitions even though they knew that the statistical data that determines the outcomes of those competitions was affected by illicit cheating.

55.     This cheating was not publicly disclosed until November 12, 2019, when Ken Rosenthal and Evan Derllich of *The Athletic* reported that members of the Astros were using an electric system to steal signs between pitchers and catchers in violation of the MLB's Official Rules. The MLB subsequently identified the offending individuals as Carlos Beltran and Alex Cora.

56.     According to *The Athletic* article, the Astros' staff set up a video "feed from a camera in center field, fixed on the opposing catcher's signs, hooked up to a television monitor that was placed on a wall steps from the team's home dugout at Minute Maid Park."[12] Using the television monitor, Astros players would watch the feed and decode the opposing team's signs. After recognition of a sign by the opposing team, the Astros' players would bang on a trash can in communication with the batter about the upcoming pitch. This is called the "Trash Can Scheme."

57.     On November 18, 2019, it was reported that the MLB had been instructing video monitors to listen for the Trash Can Scheme while at Minute Maid Park, illustrating

---

[12] Ken Rosenthal and Evan Drellich, *The Astros Stole Signs Electronically in 2017 – Part of a Much Broader Issue for Major League Baseball*, THE ATHLETIC, (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Feb. 7, 2020).

that the MLB had been aware of the organization's cheating. The MLB nonetheless failed to disclose or adequately investigate the situation.[13]

58.    The MLB, who had launched their own investigation after the news of the Trash Can Scheme broke to the public, published its results on January 13, 2020. Relevant findings of the Astros conduct were as follows:

a. At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences (*i.e.*, which sign flashed by the catcher is the actual sign) for use when an Astros runner was on second base. Once the sign sequence was decoded, a player in the video replay review room would act as a "runner" to relay the information to the dugout, and a person in the dugout would notify the players in the dugout or signal the sign sequence to the runner on second base, who in turn would decipher the catcher's sign and signal to the batter from second base.

b. Approximately two months in the 2017 season, a group of players, including Beltran discussed that the team could improve on decoding opposing teams' signs and communicating the signs to the batter. Cora arranged for a video room technician to install a monitor displaying the center field camera feed immediately outside of the Astros' dugout [. . .] One or more players watched the live feed of the center field camera on the monitor, and after decoding the sign, a player would bang nearby trash can with a bat to communicate the upcoming pitch type to the batter; and

c. [T]he Astros' replay review room staff continued, at least for part of the 2018 season, to decode signs using the live center field camera feed, and to transmit the sign to the dugout through in-person communication [hereinafter, the "Astros Replay Room Scheme"].

---

[13] Rob Manfred, *Statement of the Commissioner,* MAJOR LEAGUE BASEBALL (Jan. 13, 2020) at 2, https://img.mlbstatistic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty2717.pdf (accessed Feb. 7, 2020).

59.     The Replay Room Scheme and Trash Can Scheme were not the only offenses relevant to electronic sign stealing in MLB. Rosenthal and Drellich further reported allegations against the Red Sox that they had in place a corrupt replay room scheme of their own throughout the 2018 season.[14]

60.     The "Red Sox Replay Room Scheme" was brought to the Red Sox organization by Alex Cora, originator of the Trash Can Scheme for the Astros. According to Rosenthal and Drellich, "players visited the video replay room during games to learn the sign sequence opponents were using."[15]

61.     Akin to the Astros' corrupt practices, the Red Sox utilized electronic devices to steal their opponents' signs in violation of MLB Official rules.

62.     The MLB is currently investigating the allegations against the Red Sox and will soon publish its findings about the organization's corrupt practices.

63.     The Replay Room Scheme, Trash Can Scheme, and Red Sox Replay Room Scheme significantly affected the player performance statistics distributed by Sportradar of all MLB players involved, whether in their favor or as an opponent. The schemes also harmed the Plaintiff and the Class by distorting the player performance statistics, resulting in unfair and dishonest DFS baseball competitions.

---

[14] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Red Sex used video replay room illegally in 2018,* THE ATHLETIC (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07mlbs-sign-stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Feb.7, 2020)
[15] *Id.*

64.     Further, Sportradar, as the exclusive distributor and monitor of these statistics, equipped with investigative services and integrity protection measures, knew or was willfully unaware of the fraudulent conduct resulting in the manipulation of the player performance statistics that it distributed to DFS operators, including FanDuel.

65.     As a result, Plaintiff and other contestants participating in DFS wager competitions, including specifically FanDuel, were induced by Defendants to compete in fraudulent competitions to their financial detriment.

## IV.    Defendants' Profited From Encouraging the Class to Participate in Unfair DFS Wagering Competitions

66.     The MLB have been aware, or were willfully unaware, of allegations against teams using electronic devices to steal signs in violation of its Official Rules for years.

67.     Per the MLB's investigation of the Astros, investigators were told that as many as eight other MLB constituent teams were electronically stealing signs.[16]

68.     Several formal complaints had been filed with the MLB regarding the use of electronic devices to steal signs described herein:

   a.   In 2017 the New York Yankees filed a complaint alleging that the Boston Red Sox were stealing signs using Apple Watches in contravention of MLB rules.

   b.   In August 2018 the Oakland Athletics filed a complaint alleging that the Houston Astros were stealing signs using electronic equipment in contravention of MLB rules.

---

[16] Tom Verducci, *Why MLB Issued Historic Punishment to Astros for Sign Stealing,* SPORTS ILLUSTRATED (Jan. 13, 2020), http://www.si.com/mlb/2020/01/13/houston-astros-cheating-punishment (accessed Feb. 7, 2020).

   c.  In October 2018 the Cleveland Indians filed a complaint alleging that the Houston Astros were stealing signs using electric equipment in contravention of MLB rules.

   d.  In October 2019 the New York Yankees filed a complaint alleging that the Houston Astros were stealing signs using electronic equipment in contravention of MLB rules.

69.    Despite the multiple complaints regarding using electronic devices to steal signs, the MLB refused to disclose the practices to the public while continuing to promote participation in DFS wagering.

70.    Nor did at any point Sportradar inform the individuals relying on its statistics that there were illegal practices occurring based on a review of the MLB game data that it received. Indeed, even a cursory examination regarding a team's home versus away record should have triggered appropriate scrutiny and further action to protect individuals who paid for and relied on its statistics through DFS wagering providers, including FanDuel.

71.    Defendants have profited enormously from DFS engagement despite the compromised integrity of MLB DFS wagering contests that occurred in the 2017 – 2019 seasons, and likely beyond. The fraudulent conduct and the MLB's failure to enforce its rules, as well as failure to disclose its constituent teams' violations, resulted in dishonest and unfair wagering competitions.

72.    The amount of performance statistics that were affected are numerous, as were the number of wagering competitions that were tainted. Specifically, the player performance statistics materially affected contests in the following non-exhaustive list of ways:

a.   Contestants who drafted pitchers that were pitching against the Astros or Red Sox were harmed when they performed poorly as a result of cheating;

b.   Contestants competing against opponents who selected Astros or Red Sox players playing at home were harmed when the opponents' Astros and Red Sox players were statistically enhanced as a result of cheating;

c.   Contestants were fraudulently induced to pick Astros or Red Sox players for their DFS teams and were harmed when their players did not perform as expected during away games as a result of cheating;

d.   Red Sox and Astros players' salaries were inflated based on false statistics, causing contestants to overpay for their players as a result of cheating.

73.    As a direct and proximate result of the aforementioned misconduct, Defendants have profited enormously at the expense of the unknowing, yet fraudulently induced, DFS participants.

74.    The MLB and Sportradar have financially benefited from increased fan involvement, general interest in their sport, fan attendance, increased advertising, television revenues, and the sharing of FanDuel competition entry fees that were derived from rigged and unfair DFS wagering competitions.

75.    Plaintiff and other Class members and contestants would not have participated in FanDuel's DFS wagering competitions and/or would have been unwilling to make certain wagers had they been aware that the fairness and integrity of players' statistical measures were compromised.

## FACTS SPECIFIC TO PLAINTIFF

76.     Plaintiff Cody Lucas was an active FanDuel participant during the period at issue in this lawsuit. Plaintiff estimates that he has placed at least 128 wagers on FanDuel MLB competitions during the Class Period.

77.     Plaintiff would not have entered into FanDuel contests and/or would not have been willing to make certain wagers during the Class Period had he known about Defendants' misconduct.

78.     Further, Plaintiff would not have entered into FanDuel MLB competitions had he known the MLB and Sports radar were aware of, or should have been aware of, electronic sign stealing compromising the integrity of the player performance statistics which FanDuel used to determine the outcome of its competitions.

## CLASS ALLEGATIONS

79.     Plaintiff brings this action on his own behalf and on behalf of a nationwide class (the "Class") with one subclass (the "Subclass") defined as follows:

(i)     The Class: All persons within the United States who participated in any FanDuel MLB Daily Fantasy Sports contest between April 2, 2017 and October 30, 2019.

(ii)    The New York Subclass: All persons who were located in the State of New York when they participated in any FanDuel MLB Daily Fantasy Sports contest between April 2, 2017 and October 30, 2019.

80.     Plaintiff will fairly and adequately represent and protect the interests of the other Class and Subclass Members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class and Subclass

Members, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class and Subclass.

81.     Absent a class action, most Class and Subclass Members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

82.     Defendants have acted and failed to act on grounds generally applicable to the Plaintiff and the Class and Subclass Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and Subclass Members, and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

83.     The factual and legal bases of Defendants' liability to Plaintiff and to the other Class and Subclass Members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class and Subclass. Plaintiff and the other members of the Class and Subclass have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

84.     Upon information and belief, there are thousands of Members of the Class and Subclass such that joinder of all members is impracticable.

85.     There are many questions of law and fact common to the claims of Plaintiff and the other Class and Subclass Members, and those questions predominate over any questions that may affect individual members of the Class and Subclass. Common

questions for the Class and Subclass include, but are not limited to, the following:

(a)     Whether Defendants' misconduct compromised the fairness and integrity of FanDuel DFS competitions;

(b)     Whether Defendants' conduct constitutes negligence;

(c)     Whether Defendants are liable to Plaintiff and the Class for compromising the fairness of FanDuel DFS competitions;

(d)     Whether the Astros have engaged in false, misleading, deceptive and/or unfair acts or practices;

(e)     Whether the Red Sox have engaged in false, misleading, deceptive and/or unfair acts or practices;

(f)     Whether Defendants have been unjustly enriched by their conduct;

(g)     Whether MLB Defendants knew or reasonably should have known about its Official Rules being violated;

(h)     Whether Sportrsradar knew or reasonably should have known that the statistics it was providing to DFS wagering competitions such as FanDuel were inaccurate and a result of misleading and deceptive conduct;

(i)     Whether Plaintiff and Class Members are entitled to actual damages and/or statutory damages;

(j)     Whether Plaintiff and Class Members are entitled to restitution, disgorgement and/or other equitable relief or injunctive relief;

(k)     The appropriate measure of damages and/or other relief; and

(l)     Whether Defendants should be enjoined from continuing its unlawful practices.

## COUNT I

**For Violations of the New York Deceptive Practices Act, N.Y. GEN. BUS. § 349, *et seq.***
**(against all Defendants on behalf of the Class and Subclass)**

86.     Plaintiff hereby realleges and incorporates all of the foregoing allegations by reference as though fully set forth herein.

87.     New York Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. § 349, *et seq.* ("New York Act").

88.     During all relevant times, Defendants engaged in unfair and deceptive acts directed toward consumers in violation of the New York Act, as set forth above.

89.     Any person who has suffered a loss as a result of a violation of the New York Act may bring an action based on Defendants' deceptive or unfair acts and practices.

90.     The Defendants have been and are engaged in business, trade and commerce as defined by the New York Act. Major League Baseball is broadcast, advertised, and promoted throughout the United States, including through the sale of merchandise. Professional baseball games are held in the states of the United States. Moreover, daily fantasy sports players reside throughout the United States.

91.     Defendant MLB engages in business on behalf of its constituent member teams and Major League baseball, including in New York. MLBAM's internet and interactive services are also provided throughout the United States, including in New York. Defendant MLBAM is responsible for orchestrating the partnership between FanDuel and Major League Baseball and its teams in New York as well as throughout the country.

92.     During all relevant times, the Defendants have had a financial interest in FanDuel and have promoted their partnership with FanDuel, and have also participated in soliciting participants in FanDuel's daily and weekly fantasy baseball contests.

93.     Additionally, during all relevant times, the Defendants have realized substantial financial benefit from their partnership with FanDuel, based on the Defendants' equity interest in, sponsorship, advertising, and promotion with and through FanDuel.

94.     Fan participation in fantasy baseball contests directly resulted in financial gain to Defendants. Defendants have financial interests in the fees paid by FanDuel baseball fantasy participants and furthermore receive revenue from FanDuel's sponsorship and advertising, and moreover FanDuel's fantasy baseball participation significantly assists increased viewership and attendance of Major League Baseball games. In turn, Defendants enjoy greater revenue from broadcasting, advertising, attendance and the sale of merchandise.

95.     Defendants thus do and have had an interest in promoting FanDuel and to provide FanDuel with sponsorship, advertising, and promotional opportunities with the Defendants, which Defendants did during all relevant times, all while knowing that FanDuel's fantasy baseball contests were deceptive and unfair due to MLB's and its teams' misconduct.

96.     During the times when Defendants promoted FanDuel and its fantasy baseball contests, the Defendants knew, or should have known of, the electronic sign stealing schemes as described above but failed to stop and/or report them which resulted

in deceptive MLB player performance statistics, and in turn compromised fantasy baseball contests in which Plaintiff and the Class and Subclass participated in. Specifically, the Defendants knew, or should have know of the Houston Astros Trash Can Scheme and Replay Room Scheme and the Boston Red Sox's Replay Room Scheme, all of which were in violation of the rules and regulations of Major League Baseball and should have been stopped rather than permit Plaintiff and the other Class and Subclass Members to continue to rely on the statistics created from compromised games.

97.     Furthermore, the MLB Defendants affirmatively concealed and failed to disclose the electronic sign stealing misconduct of the Houston Astros and Boston Red Sox even though they knew that such misconduct compromised the FanDuel MLB DFS contests they were separately promoting.

98.     During all relevant times, Defendants either knew or recklessly disregarded the fact that the Major League Baseball games involving the Houston Astros and Boston Red Sox resulted in compromised and dishonest player performance statistics.

99.     Defendants' misconduct in promoting participation and wagering on FanDuel MLB DFS contests and providing compromised statistics that formed the basis of such contests, with knowledge that its member teams were compromising the honesty and integrity of those contests, and failing to take reasonable steps to prevent or remedy its member teams' misconduct or disclose the compromised nature of FanDuel's fantasy contests, as alleged herein, constitutes a deceptive practice in violation of the New York Act.

100.    As such, Plaintiff and the other members of the Class and Subclass are entitled to reimbursement of all moneys paid for their participation in the compromised FanDuel DFS contests that they participated in, an award of actual damages and exemplary damages up to three times the amount of Plaintiff's and the Class members' actual damages, an award of reasonable attorney's fees and costs, and an order granting equitable relief, including an injunction to bar Defendants' from such conduct in the future.  N.Y. GEN. BUS. §§ 349(h), 350-e(3).

### COUNT II
**For Violations of the Minnesota Consumer Fraud Act
MINN. STAT. § 325.69, *et seq.*
(against Sportradar on behalf of Plaintiff and the Class)**

101.    Plaintiff hereby realleges and incorporates all the foregoing allegations by references as though fully set forth herein.

102.    Minnesota's Consumer Fraud Act ("MCFA") prohibits "[t]he act, use or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive trade practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69 subd. 1.

103.    Plaintiff and the other Class members are consumers who have been injured by Defendant Sportradar's violations of the MCFA.

104.    Defendant Sportradar's conduct described above constitutes multiple, separate violations of the MCFA. Defendant has engaged in deceptive, misleading, and fraudulent practices with the intent that others rely thereon in connection with its services.

105.   Specifically, Defendant distributed manipulated real game time statistic to media companies and sports betting operators. Defendant was aware, or willfully unaware the statistics that it was distributing were fraudulent. Defendant engaged in this misconduct with the intention that the public at large rely on its manipulated real game time statistics. Defendant's partnership with MLB Defendants gave Sportradar not only the exclusive right to distribute and monitor its real game time statistics, but also the duty of incorporating its Integrity Services to monitor, analyze, and investigate the statistics that it is distributing.

106.   By failing to protect and monitor the integrity of the statistics, then distributing the real game time statistics to media companies and sports gambling operators, including FanDuel Defendant has engaged in deceptive, misleading, and fraudulent practices in violation of MCFA.

107.   As such, Plaintiff and the other members of the Class are entitled to reimbursement of all moneys paid for their participation in the compromised FanDuel DFS contests that they participated in and which used Sportradar's compromised statistics, as well as damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the Court, including an injunction to bar such conduct in the future.  Minn. Stat. § 8.31, subd. 3a.

**COUNT III**
**Violation of Texas Deceptive Trade Practices and Consumer Protection Act**
**Tex. Bus. & Com. Code § 17.41 *et seq.***
**(against the Houston Astros on Behalf of Plaintiff and the Class)**

108.    Plaintiff hereby realleges and incorporates all of the foregoing allegations by reference as though fully set forth herein.

109.    Under the Texas Deceptive Trade Practices & Consumer Protection Act ("DTPA") it is unlawful for any person to use or employ by any person of a false, misleading, or deceptive act that is relied on by a consumer to the consumer's detriment, to breach of an express or implied warranty, and to engage in any unconscionable action or course of action.

110.    The Astros is a "person" under Tex. Bus. & Com. Code § 17.45(3) and is subject to the DTPA.

111.    Plaintiff and the other Class members are consumers within the meaning of Tex. Bus. & Com. Code § 17.45(4) and are entitled to bring suit under the DTPA.

112.    Defendant, the Astros, violated § 17.41 of the DTPA. Specifically, that their conduct was false, misleading, or deceptive in the course of trade or commerce in violation of § 17.41 (a). Accordingly, such conduct is unlawful and subject to action under §§17.47, 17.58, 17.60 and 17.61 of the DTPA.

113.    At all times during the class period, the Astros were engaged in false, misleading, and deceptive acts in violation of § 17.41 of the DTPA through their aforementioned practice of electronic sign stealing in violation of MLB's Official Rules.

114.    The Astros are located in Texas, its games are broadcast in Texas, and it promotes and advertises its business in Texas. Defendant hosts its professional baseball games in Texas. Defendant sells merchandise in the State of Texas. Defendant is engaged in trade and commerce under the DTPA in Texas.

115.    As a result of the Astros illegal conduct, FanDuel MLB DFS competitions were affected by the unfair and unlawful performance of the Astros players and statistics involving the Astros were manipulated.

116.    Defendant advertised and promoted MLB DFS competitions during the class period as Defendant was conducting illegal activities, making its contests unfair, deceptive, and misleading. The MLB DFS competitions were compromised as a result of the Astros misconduct.

117.    During the class period and at all relevant times to this claim, Defendant Astros were engaged in electronic sign stealing through the aforementioned methods of misconduct in violation of MLB's Official Rules. As a direct result, player performance statistics were manipulated causing MLB DFS competitions to be compromised.

118.    Defendant Astros knew or should have known, or recklessly disregarded that its unlawful actions ruined the integrity and fairness of MLB DFS competitions.

119.    Plaintiff and the Class Members paid entry fee payments to enter MLB DFS competitions which were corrupt, dishonest, and false baseball contests and which fall within the definition of Tex. Bus. & Com. Code § 17.41 *et seq.*

120.    Plaintiff and the Class Members suffered ascertainable economic damages as a result of the Astros misconduct.

121.   Because the Astros misconduct in using electronic devices to steal signs in violation of the MLB Official Rules was intentional, Plaintiff and the Class Members are entitled to three times their actual damages, or exemplary damages and attorney's fees as applicable under the DTPA. Tex. Bus. & Com. Code § 17.50(b).

**COUNT IV**
**Violation of Massachusetts Regulation of Business Practice and Consumer Protection Act,**
**Mass. Gen. Laws ch. 93A, § 1 et seq.**
**(against the Red Sox on Behalf of Plaintiff and the Class)**

122.   Plaintiff hereby realleges and incorporates all of the foregoing allegations by reference as though fully set forth herein.

123.   Under Massachusetts Regulation of Business Practice and Consumer Protection Act ("MCPA"), it is unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 1.

124.   Defendant the Red Sox violated the MCPA. Specifically, that their conduct was unfair and deceptive in the marketplace in violation of Chapter 93A. Accordingly, such conduct is unlawful and subject to action.

125.   Plaintiff and Class members are consumers who have been injured by the Red Sox's unlawful conduct in violation of the MCPL and who thus have standing to sue.

126.   The Red Sox are located in Massachusetts, its games are broadcast in Massachusetts, and it promotes and advertises its business in Massachusetts. The Red Sox host its professional baseball games in Massachusetts. The Red Sox sell merchandise in

the State of Massachusetts. The Red Sox are engaged in trade and commerce under the MCPL in the state of Massachusetts.

127.   As a result of the Red Sox's illegal conduct, FanDuel MLB DFS competitions were affected by the unfair and unlawful performance of the Red Sox players and statistics involving the Red Sox were manipulated making the contests unfair, deceptive, and misleading. The MLB DFS competitions were compromised as a result of the Red Sox misconduct.

128.   The Red Sox knew or should have known, or recklessly disregarded that its unlawful actions ruined the integrity and fairness of MLB DFS competitions.

129.   Plaintiff and the Class Members suffered ascertainable damages as a result of the Red Sox deceptive and unfair misconduct.

130.   Because the Red Sox's misconduct in using electronic devices to steal signs in violation of the MLB Official Rules was intentional, Plaintiff and the Class Members are entitled to three times their actual damages, or exemplary damages and attorney's fees as applicable under the MCPL. Mass. Gen. Laws ch. 93A, § 9.

**<u>COUNT V</u>**
**Unjust Enrichment**
**(against all Defendants on behalf of the Class)**

131.   Plaintiff hereby realleges and incorporates all of the foregoing allegations by reference as though fully set forth herein.

132.   Defendants, during all material time, have directly benefited in significant financial gain from their partnership with FanDuel. This is due to Defendants' revenue sharing in FanDuel MLB DFS contest entry fees, sponsorship, advertising and promotion.

133.     Further, Defendants have also significantly benefited from fan participation in FanDuel's fantasy baseball contests that have resulted in increased attention paid to Major League Baseball games and as such the increased revenue from broadcasts of Major League Baseball games, attendance to Major League Baseball games and sale of merchandise thereof.

134.     Defendants, during all material time, promoted and actively contributed to the operation of FanDuel's MLB DFS wagering platform and induced Plaintiff and the other Class Members to participate in said contests in order for MLB Defendants to benefit in financial gain.

135.     Defendants, during all material time, knew of but failed to disclose that the Houston Astros and Boston Red Sox were engaged in electronic sign stealing tactics that resulted in deceptive and dishonest player performance statistics and in turn FanDuel's fantasy baseball contests that were corrupted.

136.     Plaintiff and the other Class Members incurred significant financial losses from paying entry fees and wagering on FanDuel Major League Baseball DFS contests that were unfair and corrupted and in turn conferred substantial financial benefits onto Defendants through Defendants' partnership with FanDuel that resulted in the form or a share of FanDuel's Major League Baseball DFS contest entry fees.

137.     Plaintiff and Class Members also conferred additional unfair substantial monetary benefits to Defendants in the form of financial gain from increased attention to the MLB Defendants' games, including from additional broadcasting, attendance, advertising and merchandise sales.

138.   Defendants knew, or should have known about the wrongful conduct undertaken by the member teams, and failed to stop or report it, all the while enjoying the monetary benefits conferred upon them by Plaintiff and the other Class Members.

139.   Under principles of equity and good conscience, Defendants should not be permitted to retain the foregoing monetary benefits that were a product of their deceitful behavior and resulted at the expense of Plaintiff and the other Class Members.

140.   As a direct and proximate result of the Defendant's wrongful conduct, the Defendants are liable to Plaintiff and the other Class Members for the amount of monetary benefits conferred upon the Defendants, including, without limitation, the profits, benefits and other financial benefits deceitfully obtained.

141.   Defendants should be compelled to disgorge into a common fund or constructive fund all unjust proceeds received or realized as a result of their wrongful conduct for the benefit of Plaintiff and the other Class Members.

## COUNT VI
### Negligence
### (against all Defendants on behalf of the Class)

142.   Plaintiff hereby realleges and incorporates all of the foregoing allegations by reference as though fully set forth herein.

143.   Defendants, during all material time, had a vested financial interest and partnership with FanDuel and promoted and solicited contestants to participate in FanDuel's MLB DFS contests. Defendants received significant financial gain through their vested financial interest and partnership with FanDuel.

144.    Defendants, during all material time, knew of or should have known that FanDuel's MLB DFS contest participants, including Plaintiff and the other Class members, relied on the honesty and accuracy of MLB's player performance statistics in deciding to spend their money to participate and compete in FanDuel's MLB DFS contests.

145.    Defendants, during all material time, knew of or should have known that participants in FanDuel's MLB DFS contests, including Plaintiff and the other Class Members, were not aware that Defendants' member teams, including the Houston Astros and Boston Red Sox, were engaging in illegal electronic sign stealing schemes per the MLB's rules and regulations that compromised the integrity of FanDuel's fantasy baseball contests.

146.    Due to Defendants' partnership with FanDuel and its promotion of FanDuel MLB DFS Contests, undertaken due to Defendants' financial interest in FanDuel, and by virtue that MLB Defendants had knowledge that participants' decisions to engage in FanDuel's MLB DFS contests relied upon the assumption of the honesty and integrity of MLB player performance statistics, (1) Defendants had a duty to take reasonable steps to ensure that MLB's player performance statistics were honest and accurate, (2)  to investigate any team or player misconduct that might jeopardize the integrity of MLB player's performance statistics, (3) take reasonable steps to deter any misconduct of team or player that might jeopardize MLB's player performance statistics, and (4) to disclose to potential FanDuel MLB DFS contest participants any information that Defendants either knew or should have known of team or player misconduct that might jeopardize the honesty of MLB's player performance statistics.

147.   Defendants, however, breached their obligation to Plaintiff and the other Class Members in the following ways:

a.   Defendants failed to take reasonable steps to ensure that player performance statistics upheld standards of honesty and integrity and were not unfairly influenced by the misconduct of any team or player;

b.   Defendants failed to adequately investigate reported misconduct of its member teams and players that should have called into question the integrity of MLB player performance statistics;

c.   Defendants failed to take reasonable steps to deter any of its member teams and their players from participating in conduct that would compromise the integrity of player performance statistics; and

d.   Defendants failed to disclose to potential FanDuel MLB DFS contest participants information that they knew or should have known in regard to its member teams' and players misconduct that might have been unfairly influencing the integrity of MLB player performance statistics.

148.   As a direct, foreseeable and proximate result of Defendants' negligent conduct, Plaintiff and the other Class Members have suffered actual monetary damages, pecuniary losses, and other significant harms and are entitled to an award of damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully prays for the following relief:

a.    Entry of an order certifying the Class and Subclass as requested herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel.

b.    An award to Plaintiff and each member of the Class and Subclass of actual, compensatory, general and/or statutory damages in an amount to be determined at trial.

c.    Restitution and/or disgorgement from Defendants in an amount to be determined at trial;

d.    An award to Plaintiff and the Class and Subclass of exemplary and/or double or treble damages, as allowed by law, in an amount to be determined at trial;

e.    Injunctive relief and/or other appropriate equitable relief for Plaintiff and the Class and Subclass;

f.    Entry of an order enjoining Defendants from continuing to engage in the unlawful conduct and practices described herein;

g.    An award of attorney's fees and costs;

h.    All forms of relief set forth above; and

i.    Such further and other relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: February 26, 2020         LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By: s/ Robert K. Shelquist
Robert K. Shelquist, #21310X
Rebecca A. Peterson, #0392663
100 Washington Ave., Ste. 220
Minneapolis, MN 55401
Tel: (612) 339-6900
rkshelquist@locklaw.com
rapeterson@locklaw.com

Myles McGuire (*pro hac vice* to be filed)
Paul T. Geske (*pro hac vice* to be filed)
Eugene Y. Turin (*pro hac vice* to be filed)
Timothy P. Kingsbury (*pro hac vice* to be filed)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
pgeske@mcgpc.com
eturin@mcgpc.com
tkingsbury@mcgpc.com

**Counsel for Plaintiff and the
Putative Class and Subclass**